UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALFREDO MUNOZ-BARBA, et al.,

Plaintiffs,

v.

ALEJANDRO MAYORKAS,

Defendant.

Case No.  23-cv-03675-JCS

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR DISCOVERY UNDER FED.R.CIV. P. 56(D)**

Re: Dkt. No. 26

## I.    INTRODUCTION

Plaintiffs Alfredo Munoz-Barba and Karina Chavez-Alvarez initiated this immigration mandamus action seeking to compel United States Citizenship and Immigration Services ("USCIS") to schedule an interview and adjudicate Plaintiff Munoz-Barba's pending I-589 asylum application. Presently before the Court is Plaintiffs' Motion for Discovery Under Fed.R.Civ.P. 56(d) ("56(d) Motion").  A hearing on the Motion was held on May 31, 2024.  For the reasons stated below, the 56(d) Motion is GRANTED in part and DENIED in part.[1]

## II.    BACKGROUND

### A.    Procedural Background

Plaintiff Munoz-Barba seeks humanitarian asylum in the United States based on past persecution and serious harm related to his four-year old U.S. citizen child's chromosome disorder, necessitating critical educational, social and medical care in the United States.  Compl. ¶¶ 5-6. He filed an I-589 application for asylum with the San Francisco Asylum Office on July 16, 2020, and listed his spouse, Plaintiff Chavez-Alvarez, as a dependent family member on his

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

application. *Id.* ¶¶ 3, 8, 14.   Munoz-Barba alleges that "[t]he mental health sequelae of a childhood filled with brutal violence during his formative years interfered with Mr. Muñoz's ability to apply for asylum within his first year of entry and warrant an exception to the one-year deadline for exceptional circumstances" under 8 U.S.C. § 1158(a)(2)(B).  *Id.*  ¶ 7.

Plaintiffs claim that the length of time that their asylum application has been pending without adjudication is unreasonable. *Id.* ¶ 8. Plaintiffs bring two causes of action: (1) a claim that Defendant's failure to conduct an interview and adjudicate Plaintiffs' asylum application entitles them to mandamus relief under 28 U.S.C. § 1361, *id.*  ¶¶ 16-22; and (2) a claim that the failure to conduct an interview and adjudicate their application constitutes "unreasonable delay" under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1), *id.* ¶¶ 23–26.

On July 26, 2023, the Court issued the Scheduling Order for Immigration Mandamus Case, dkt. no. 4 ("Scheduling Order"), which implements the Court's General Order 61.  Under the Scheduling Order, "Plaintiff may file a motion for summary judgment at any time permitted by the Federal Rules of Civil Procedure and this court's local rules . . . ." Scheduling Order ¶ 2.  The Scheduling Order further provides that "[i]f Plaintiff has not filed a motion for summary judgment within 90 days of filing the complaint, Defendant shall be the party who shall first file a motion for summary judgment, and the defendant must serve and file that motion within 120 days of service of the complaint."  *Id.*  ¶ 3. Under the Scheduling Order, the plaintiff's opposition or counter-motion is due within thirty days of service of the defendant's summary judgment motion "[u]nless a motion pursuant to Federal Rule of Civil Procedure 56(d) is filed."  *Id.* ¶ 4.

Plaintiffs did not file a motion for summary judgment within 90 days of filing the complaint and so Defendant filed a motion for summary judgment on January 30, 2024.  Dkt. no. 24 ("Summary Judgment Motion").  In the Summary Judgment Motion, Defendant argues that based on consideration of the factors set forth in *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) – the so-called *TRAC* factors – USCIS has not unreasonably delayed the adjudication of Plaintiffs' asylum application as a matter of law.  Defendant submitted supporting declarations from: (1) John L. Lafferty, Chief of the Asylum Division, USCIS, U.S. Department of Homeland Security ("DHS"), dkt. no. 23; (2) Danielle Lehman, Director of the San

2

Francisco Asylum Office, an office within USCIS, U.S. DHS, dkt. no. 23-1; and (3) Elizabeth Kurlan, Assistant United States Attorney and counsel of record for Defendant in this case, dkt. no. 23-2.  It also submitted documentary evidence relating to, *inter alia*, USCIS's policies and procedures with respect to asylum petitions.  Kurlan Decl., Exs. 1-10.

Instead of opposing Defendant's Summary Judgment Motion, Plaintiffs brought the instant motion, seeking discovery under Fed.R.Civ.P. 56(d). The parties then stipulated to a briefing schedule on the 56(d) Motion and stayed Defendant's Summary Judgment Motion pending the Court's ruling on the Rule 56(d) Motion.

## B.    The *TRAC* Factors

The APA permits a court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The following factors, often referred to as the "*TRAC* factors," inform courts' decisions whether to grant such relief:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason [;] (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake [;] (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority[;] (5) the court should also take into account the nature and extent of the interests prejudiced by the delay[;] and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

*Independence Mining Co., Inc. v. Babbit*, 105 F.3d 502, 507 & n.7 (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d at 80) (alterations in original).  Claims challenging unreasonable agency delay under the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361, are "'in essence'" claims "for relief under § 706 of the APA," and courts treat them identically.  *See id.* at 507 (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986)).

## C.    LIFO and FIFO

Under the Immigration and Nationality Act ("INA"), a noncitizen "who is physically present in the United States or who arrives in the United States" may apply to receive asylum in the United States, subject to certain exceptions. 8 U.S.C. § 1158(a).  An individual who applies for

asylum under this section must demonstrate by clear and convincing evidence that the application has been filed within one year after the date of their arrival in the United States, 8 U.S.C. § 1158(a)(2)(B).  Otherwise, their application will be considered only if they can demonstrate the "existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay."  8 U.S.C. § 1158(a)(2)(D).

No sooner than 150 days after an applicant has filed their asylum application they may apply for authorization to maintain employment while their asylum application is pending. 8 C.F.R. § 208.7(a)(1).  Employment authorizations are renewable for a continuous period, in increments of up to five years. 8 C.F.R. § 208.7(b); USCIS Policy Manual, Vol. 10, Part A, Ch. 4, § C.1, https://www.uscis.gov/policy-manual/volume-10-part-a-chapter-4.

According to John L. Lafferty, Chief of the Asylum Division of USCIS, in the early 1990s the former Immigration and Naturalization Service ("INS") began automatically mailing employment authorizations to asylum applicants upon receipt of the asylum application and these authorizations remained valid until the applications were fully adjudicated. Decl. of John L. Lafferty, dkt. no. 23 ("Lafferty Decl.") ¶ 15. Lafferty states that this practice led to "the filing of frivolous, fraudulent, or otherwise non-meritorious applications primarily to secure employment authorization" and contributed to an increase in the number of pending asylum cases, which was over 400,000 by 1994.  *Id.*

In response, Lafferty states, in 1995, the INS implemented the "Last-In-First-Out" ("LIFO") scheduling system, under which recently filed cases were scheduled for interview before older cases. *Id*. ¶ 17. According to Lafferty, the reason for this policy change was the expectation that the shorter processing period would discourage people from filing non-meritorious claims simply to obtain work authorization while their applications were pending.  *Id.* Lafferty further states that over time, this change accomplished its objective, reducing the backlog of asylum applications from over 464,100 applications at the end of fiscal year 1995 to just over 4,200 applications that had been pending over six months by the beginning of fiscal year 2013. *Id*. ¶ 18.

Lafferty further recounts that in around 2013, the effectiveness of LIFO began to diminish because of "the rise in credible and reasonable fear cases."  *Id.* ¶ 19.  Lafferty explains that

"[b]ecause of the urgent need to address the staggering increase of credible and reasonable fear cases, very few Asylum Officers were available to adjudicate affirmative asylum applications. This situation led to an increase in the backlog and longer processing times for older cases." *Id.* This situation was exacerbated by "dramatic increase in the number of unaccompanied children who applied for asylum with USCIS, from 410 in 2012, to 18,060 in 2017." *Id.* ¶ 20. In response to this surge, "the Asylum Division also began prioritizing the processing of unaccompanied child cases, which further diverted Asylum Officers from the adjudication of other affirmative asylum applications." *Id.* Lafferty explains that "[u]nder these circumstances, where most Asylum Officers were assigned to address the surge of credible fear, reasonable fear cases, and unaccompanied child cases at the border, the effectiveness of the LIFO scheduling system in discouraging non-meritorious filings was undermined because very few affirmative cases could be adjudicated in any event." *Id.* ¶ 21.

Thus, in December 2014, USCIS announced it would temporarily adopt a "First-In-First-Out" ("FIFO") policy, under which asylum applications were processed in the order in which they were filed. *Id.* ¶ 21. According to Lafferty, in the years following the adoption of FIFO, the number of applications for employment authorization documents by initial pending asylum applicants increased more than sixfold, and there was a "substantial increase in non-meritorious asylum applications, filed primarily to obtain work authorizations." *Id.* ¶ 22.

"In order to stem the growth of the agency's asylum application backlog and identify non-meritorious asylum claims sooner, on January 31, 2018, USCIS announced that it would return to the LIFO scheduling system." *Id.* ¶ 24. By this time, Lafferty states, "USCIS faced a crisis-level backlog of 311,000 pending asylum applications." *Id.* ¶ 25. To address this backlog, USCIS adopted the following "priorities" for scheduling asylum interviews, to which it continues to adhere:

> (a) Applications that were scheduled for an interview, but the interview needed to be rescheduled at the applicant's request or because of the needs of USCIS;
> (b) Applications pending 21 days or less since filing; and
> (c) All other pending applications, starting with newer filings and working back toward older filings.

*Id.* However, "Asylum Office Directors may exercise discretion to adjudicate urgent cases ahead

of others where exigent circumstances support expediting adjudication of a particular application." *Id.* ¶ 27.

"LIFO is a capacity-based scheduling system" and therefore, "during periods when asylum applications and additional caseloads surge, not all recently filed applications can be scheduled, even if they meet the above-mentioned criteria, due to staffing limitations, physical office space, and shifting priorities that require Asylum Officers to be reassigned to other urgent caseloads[.]" *Id.* ¶ 26.  Lafferty states that "[c]ases that are not scheduled in accordance with the LIFO priorities are placed into the backlog[.]" *Id.*  He further notes:

> DHS prepared for a substantial increase in encounters of noncitizens at the southwest border in light of the end of the Title 42 policy by temporarily assigning nearly all available asylum officers to the credible fear and reasonable fear workloads. The agency's need to temporarily divert most asylum officers to the border to assist with protection screenings means affirmative asylum interview slots are limited.

*Id.* n. 6.

Lafferty opines that "the LIFO scheduling system is a critical element in slowing the growth of the pending application caseload and efficiently processing all pending asylum applications by eliminating the incentive to file non-meritorious asylum applications solely to obtain employment authorization." *Id.* ¶ 28.  He cites USCIS statistics showing that beginning in 2019 the rate of growth of the backlog diminished. *Id.* & Chart 2.  Likewise, "[f]ollowing the reinstitution of LIFO in January 2018, the number of affirmative asylum applications filed per year decreased, from 141,695 in FY 2017, to 106,147 in FY 2018 (-25%), to 95,959 in FY 2019 (-10%), to 94,077 in FY 2020 (-2%), and to 59,416 in FY 2021 (-36.8%)." *Id.* ¶ 33.

Nevertheless, the number of affirmative asylum applications filed in 2022 increased dramatically, to 240,787 applications – an increase of 305% compared to the previous year. *Id.* ¶ 34 & Chart 2.  As of the third quarter of 2023, 316,495 new asylum applications had been filed. *Id.*  According to Lafferty, this increase was not related to LIFO; he states that "data" indicates that LIFO "continues to disincentivize non-meritorious filings submitted primarily to obtain employment authorization." *Id.*  Instead, Lafferty attributes the increase to a surge in applications from Cuban and Venezuelan nationals, which comprise 44% of total receipts in FY 2023 through

1   Q3.  *Id.*

2          Lafferty states in his declaration that "[f]ollowing the President's budget request for FY

3   2022, USCIS received $250 million for application processing, including the reduction of the

4   asylum backlog." *Id.*  ¶ 49.  Some of that money was earmarked to hire 80 new asylum officers

5   "who will be solely focused on work related to backlog cases or backlog reduction." *Id.*

6   According to Lafferty, "[h]iring of this staff began in FY 2022 and continues in FY 2023." *Id.* He

7   further states that "USCIS is targeting completion of at least 1,000 of the longest pending

8   affirmative asylum cases per month [and that] USCIS met that target for FY 2022." *Id.*   Lafferty

9   does not address whether this goal was meet in 2023 or the first half of 2024. He states that

10  "[o]ther staff will be assigned to processing these longest pending cases as resources permit." *Id.*

11          **D.      Functioning of the San Francisco Asylum Office**

12          The San Francisco Asylum Office has jurisdiction to conduct affirmative asylum

13  interviews for applicants residing in Northern California, Oregon, Washington, Alaska and

14  Western Nevada.  Declaration of Danielle Lehman, dkt. no. 23-1 ("Lehman Decl.") ¶ 2. According

15  to the Director of the San Francisco Asylum Office, Danielle Lehman, with the return to LIFO

16  announced in January 2018, the San Francisco Asylum Office began scheduling recently filed

17  cases for interview ahead of older cases. *Id.*  ¶ 5.  On March 18, 2020, the office was closed due

18  to COVID but interviews were resumed on June 8, 2020 with the implementation of CDC social

19  distancing guidelines. *Id* ¶ 8.  The office operated at a reduced capacity until March 2022 due to

20  COVID. *Id.*  ¶ 9.

21          Lehman states that "[p]rior to the COVID pandemic, the San Francisco Asylum Office

22  scheduled on average 105 – 125 asylum interviews each week." *Id.* ¶ 10.  She further states that

23  "[u]ntil May 12, 2023, the San Francisco Asylum Office scheduled an average of 40 – 45

24  interviews each week." *Id.*   Since that time, however, that number has dropped even further,

25  apparently.  In particular, Lehman states that "[c]urrently . . . the San Francisco Asylum Office

26  must divert a substantial majority of available asylum officers to assist with asylum pre-screening

27  interviews at the Southwest Border and other high-priority caseloads, significantly decreasing

28  capacity to conduct affirmative asylum interviews." *Id.*  It is not clear how many interviews (if

United States District Court
Northern District of California

1   any) the San Francisco Asylum Office is conducting at this point.  Lehman anticipates that there

2   will be "increasing capacity to conduct affirmative asylum interviews once the office's operational

3   posture allows the office to place more asylum officers back on the affirmative asylum caseload."

4   *Id.*

5       **E.    Plaintiff's Asylum Application**

6       According to Lehman, the asylum application submitted by Munoz-Barba falls into LIFO

7   category (c), that is, "cases that had not been rescheduled or pending less than 21 days." *Id.* ¶ 15.

8   She states that Munoz-Barba's initial application for employment authorization (Form I-765) was

9   granted effective May 19, 2021 and a subsequent renewal application was also granted. *Id.* ¶ 18.

10  She states that Munoz-Barba is currently authorized to work and that he is eligible to renew his

11  employment authorization for the entire pendency of his asylum application. *Id.* The same is true

12  as to Chavez-Alvarez. *Id.* ¶ 19.

13      **F.    The 56(d) Motion**

14      Plaintiffs contend they are unable to oppose Defendant's Summary Judgment Motion

15  without discovery that will allow them to address the *TRAC* factors.  Motion at 16-31.[2] They ask

16  the Court to allow them to propound on Defendant requests for documents and interrogatory

17  responses, as set forth in the Declaration of Kevin M. Crabtree in Support of Plaintiffs'

18  Request for Limited Discovery under F.R.C.P. 56(d) ("Crabtree Decl").

19      Plaintiffs seek discovery of the following documents:

20          11. All documents and records referenced by and relied upon in the
            declaration of John L. Lafferty, Chief of the Asylum Division. See
21          Lafferty Decl. ECF 23. Plaintiffs and the Court are entitled to review
            the factual underpinnings of the agency's asserted policies rather than
22          merely accepting unsupported, incomplete factual assertions and
            statistics taken out of context.
23
24          12. All documents and records referenced by and relied upon in the
            declaration of Danielle Lehman, Director of the San Francisco
25          Asylum Office. See Lehman Decl. ECF 23-1. Plaintiffs and the Court
            are entitled to review the factual underpinnings of the agency's

26  _____

27  [2] Pursuant to Civil Local Rule 7-2(b), motions are not to exceed 25 pages without permission from
    the Court.  Plaintiffs' motion exceeded that limit by five pages and Plaintiffs did not ask for leave
28  to exceed the page limit.  Plaintiffs are cautioned to adhere to this Court's rules, including page
    limits.

United States District Court
Northern District of California

asserted policies rather than merely accepting unsupported, incomplete factual assertions, and statistics taken out of context.

13. The Asylum Division's "productivity matrix" referenced by Chief Lafferty. ECF 23 para. 111.

14. Director Lehman states that the San Francisco Asylum office scheduled an average of 105-125 asylum interviews each week before the COVID-19 pandemic, and until May 12, 2023, scheduled an average of 40-45 interviews each week. See ECF 23-1 para. 10. She continues on to state that "currently, however, the San Francisco Asylum office must divert a substantial majority of available asylum officers to assist with asylum prescreening interviews at the Southwest Border and other high-priority caseloads, significantly decreasing the capacity to conduct affirmative interviews." *Id*. para. 11. Plaintiffs seek the sources relied upon by Ms. Lehman for the statements in her declaration paragraph 10.

15. Director Lehman states that she anticipates increasing capacity to conduct affirmative asylum interviews once the officer's operational posture allows the office to place more asylum officers back on the affirmative asylum caseload. ECF 23-1 para. 12. Plaintiffs seek production of documents relating to the San Francisco Asylum Office's "operational posture."

16. Director Lehman states that applicants may request expedited interviews due to urgent humanitarian emergencies. ECF 23-1 para. 21. Plaintiffs seek production of documentation showing what percentage, and what overall number, of requests to expedite were granted in the San Francisco Asylum Office between the months of August 2020 and January 2024, when those applications were filed, and what kind of official made that decision in each case17. Plaintiffs seek production of documentation showing the legal authority for the expedite program.

18. Chief Lafferty states that in 1995, the legacy INS implemented a "Last-In-First-Out" ("LIFO") scheduling system. ECF 23 para. 17. Plaintiff seeks production of any policy memorandum or directive implementing this scheduling system.

19. Chief Lafferty states that the LIFO program reduced the incentive engendered by the backlog to file non-meritorious asylum applications just to obtain work authorization. *Id*. Plaintiff seeks production of the source relied upon by Chief Lafferty for the statement that LIFO reduced the incentive to file non-meritorious asylum applications. This evidence is necessary to establish facts relating to the question of whether Defendant is in fact following a rule of reason and, in turn, whether the time to process Plaintiffs' application is reasonable.

20. Chief Lafferty states that the effectiveness of LIFO in discouraging non-meritorious filings was "undermined" in 2013 due to a surge of credible fear, reasonable fear and unaccompanied child cases at the border "because very few affirmative cases could be adjudicated in any event." ECF 23 para. 21. Yet Chief Lafferty states in the same declaration that the Asylum Division's processing of affirmative asylum applications is currently also constrained by those

exact same competing priorities (credible fear, reasonable fear and unaccompanied minor cases plus the addition of priority Afghan cases), the LIFO scheduling system is being successful employed to reduce the backlog. *Id.*, 56. Plaintiffs seek production of all sources relied upon by Chief Lafferty to reach those two seemingly inconsistent conclusions.

21. Chief Lafferty's declaration states that USCIS re-implemented LIFO in January of 2018. Plaintiffs seek production of any policy memorandum or directive re-implementing this scheduling system. ECF 23 para. 24.

22. Chief Lafferty states that during a surge, cases that cannot be immediately scheduled in accordance with their respective LIFO priorities due to capacity constraints are placed into the backlog. ECF 23 para. 26. Plaintiffs seek discovery in the form of an interrogatory response as to: (a) what constitutes a "surge," (b) whether and how the determination that the Asylum Division is experiencing a "surge" suspends, or otherwise affects, LIFO scheduling, and (c) for which months or years since LIFO's implementation in the 1990s, USCIS has determined itself to be experiencing a "surge."

23. Plaintiff also seeks the production of all Asylum Division memoranda and policy documents employing the term "surge."

24. Chief Lafferty states that "the agency's need to temporarily divert most asylum officers to the border to assist with protection screenings means affirmative asylum interview slots are limited." ECF 23, n. 6. Plaintiff seeks documentation showing how many asylum officers actually conducted affirmative asylum interviews nationally and in San Francisco per day on average during the time period of August 1, 2020, to January 31, 2024 (during the time period that Plaintiffs' applications have been pending).

25. Chief Lafferty states that the LIFO scheduling system is a critical element in slowing the growth of the backlog, and relies on "Chart 2" in his declaration for this assertion. ECF 23, 32-33. Plaintiffs note that Chart 2 shows that the backlog grew by 77% in 2015, the year after LIFO was suspended and FIFO was implemented and, by comparison, grew by the nearly identical 78% in 2023, a year in which LIFO had already been implemented for five years. This rebuts the argument that LIFO is being applied and is a rule of reason, or at a minimum, suggests that additional fact-finding through discovery is justified. While the number of affirmative applications filed annually increased by 46% in 2015 (following implementation of FIFO), the number of affirmative applications increased by 305% in 2022 and 88% in 2023, respectively, both during years when LIFO has theoretically been in place. While Chief Lafferty credits the 2022 and 2023 increases to increased applications from applicants from Cuba and Venezuela during those years [ECF 23, 34-35], he does not produce nationality-based application statistics that could just as easily account for the increase in applications for 2014-2017, due to widely reported instability from gang violence and droughts in Central America. See "Central American Migration: Root Causes and U.S. Policy," Congressional Research Service, Nov. 30, 2023, available at: https://sgp.fas.org/crs/row/IF11151.pdf. Plaintiff seeks

production of that information through any documentation maintained by USCIS, as it is relevant to whether LIFO is actually a rule of reason.

26. Chief Lafferty states that the USCIS has noticed an increasing number of non-meritorious asylum applications submitted primarily to obtain employment authorization as well as an increasing number of late-filed "cancellation cases." ECF 23, 35. Plaintiffs seek production of USCIS memoranda and policy documents employing the terms "nonmeritorious" and "cancellation cases."

27. Plaintiffs seek production of the source upon which Chief Lafferty relies to make the assertions that certain cases are "non-meritorious" and/or "cancellation cases."

28. Plaintiffs seek production of any document in Plaintiffs' immigration records ("A file") containing either of those terms. The use of these terms implies that the agency may be conducting some sort of initial, prima facie determination of asylum applications.

29. Chief Lafferty states that USCIS received $250 million for application processing, including the reduction of the asylum backlog, as part of the President's budget request for FY 2022. ECF 23 para. 49. As a result 80 asylum officers were hired. Id. Plaintiffs seek production of documents and interrogatory responses responsive to the question of how many applicants those 80 asylum officers have interviewed on average per month (after receiving their 300 hours of training).

30. Plaintiffs seek any evidence that USCIS is actually scheduling affirmative interviews in accordance with the priorities outlined in LIFO[.]

Crabtree Decl. ¶¶ 11-30.  Plaintiffs also seek responses to the following interrogatories:

32. Chief Laferty [sic] states the Asylum Division's productivity matrix assumes that it takes approximately four hours for an Asylum Officer to adjudicate an affirmative asylum application and that officers are expected to conduct two affirmative asylum interviews per day for four days. ECF 23 para. 11. Plaintiffs seek a response to the interrogatory: How many asylum interviews were actually (as opposed to expected to be) conducted on average nationally over the period of August 1, 2020, to January 31, 2024 (the period of time in which Plaintiffs' applications have been pending)?

33. Director Lehman states that the San Francisco Asylum office scheduled an average of 105-125 asylum interviews each week before the COVID-19 pandemic, and until May 12, 2023, scheduled an average of 40-45 interviews each week. See ECF 23-1 para. 12. She continues on to state that "currently, however, the San Francisco Asylum office must divert a substantial majority of available asylum officers to assist with asylum prescreening interviews at the Southwest Border and other high-priority caseloads, significantly decreasing the capacity to conduct affirmative interviews." *Id.*, 13. Plaintiffs seek a response to the interrogatory: how many affirmative asylum interviews were actually conducted per week in San Francisco

11

from May 12, 2023 to January 31, 2024 (the period of time in which Plaintiffs' applications have been pending)?

34. Director Lehman states that she anticipates increasing capacity to conduct affirmative asylum interviews once the officer's operation [sic] posture allows the office to place more asylum officers back on the affirmative asylum caseload. ECF 23-1 para. 12. Plaintiffs seek a response to the following interrogatories: (a) What circumstances will allow the office's operational posture to permit more affirmative interviews? Are these circumstances reasonably anticipated to occur within the next two years? Why or why not?

35. Director Lehman states that applicants may request expedited interviews due to urgent humanitarian emergencies. ECF 23-1 para. 21. Plaintiffs seek interrogatory responses to the questions of: (a) what percentage, and what overall number, of requests to expedite were granted in the San Francisco Asylum Office between the months of August 2020 and January 2024, (b) when those applications were filed, and (c) who made that decision in each case?

36. The declaration of Chief Lafferty references the ability of asylum applicants to apply for, and receive, Advance Parole. ECF 23 para. 9. Plaintiffs seek a response to the interrogatories: (a) how many asylum applicants nationally actually applied for, and were granted, Advance Parole while their asylum request was pending between August of 2020 and January of 2024? Of those individuals, how many were applicants who entered without inspection. This interrogatory is necessary to determine the genuine availability of such "relief" and how, if at all, this offsets the human health and welfare TRAC factor concerns in this case.

37. Chief Lafferty states that during a surge, cases that cannot be immediately scheduled in accordance with their respective LIFO priorities due to capacity constraints are placed into the backlog." ECF23 para. 26. Plaintiffs seek discovery in the form of responses to the interrogatories: (a) what constitutes a "surge," (b) whether and how the determination that the Asylum Division is experiencing a "surge" suspends, or otherwise affects, LIFO scheduling, and (c) for which months or years since LIFO's implementation in the 1990s, USCIS has determined itself to be experiencing a "surge."

38. Chief Lafferty states that "the agency's need to temporarily divert most asylum officers to the border to assist with protection screenings means affirmative asylum interview slots are limited." ECF 23, n. 6. Plaintiff seeks response to the interrogatory: how many asylum officers actually conducted affirmative asylum interviews of applicants in San Francisco per day on average during the time period of August 1, 2020, to January 31, 2024 (during the time period that Plaintiffs' applications have been pending)?

39. Chief Lafferty states that the LIFO scheduling system is a critical element in slowing the growth of the backlog, and relies on "Chart 2" in his declaration for this assertion. ECF 23, 32-33. Plaintiffs note that Chart 2 shows that the backlog grew by 77% in 2015, the year after LIFO was suspended and FIFO was implemented and, by comparison, grew by the nearly identical 78% in 2023, a year in which

LIFO had already been implemented for five years. This indicates that additional fact-finding through discovery may rebut the argument that LIFO is being applied and is a rule of reason. While the number of affirmative applications filed annually increased by 46% in 2015 (following implementation of FIFO), the number of affirmative applications increased by 305% in 2022 and 88% in 2023, respectively, both during years when LIFO has theoretically been in place. While Chief Lafferty credits the 2022 and 2023 increases to increased applications from applicants from Cuba and Venezuela during those years [ECF 23 para. 34-35], the production of nationality-based application statistics for 2014-2017 could likewise account for the increase in applications during those years, due to widely reported instability from gang violence and droughts in Central America. See "Central American Migration: Root Causes and U.S. Policy," Congressional Research Service, Nov. 30, 2023, available at: https://sgp.fas.org/crs/row/IF11151.pdf. Plaintiff therefore seeks a response to the interrogatory: were there any increased applications from certain nationalities or regions from January 2014 to December 2017? This information is relevant to whether LIFO is actually a rule of reason.

40. Chief Lafferty states that "although most asylum office operations have since returned to normal [after the pandemic], the lingering effects of the pandemic will be felt for a long time." ECF 23 para. 55. Plaintiffs seek response to the following interrogatory: are any asylum officers still operating at a reduced capacity due to the Covid-19 global pandemic?

41. Plaintiffs seek a response to the interrogatories: (a) why and when are some interviews scheduled in a manner not following LIFO, and (b) what kind of official makes those scheduling decisions?

42. For applications filed within the jurisdiction of the San Francisco Asylum Office: (a) How many applications were decided between August 1, 2020, and January 31, 2024? (b) On what dates were these applications received? (c) On what dates were these applicants interviewed? (d) On what dates were the decisions issued? (e) Were any expedited, "short notice" or other exigent factors applied in these cases?

*Id.* ¶¶ 32-42.

Finally, Plaintiffs ask that they be permitted to seek additional documents and interrogatory responses if warranted based on the response to the discovery described above. *Id.* ¶ 43. According to Plaintiffs' counsel, his "attempt to informally obtain discovery via email to opposing counsel on January 27, 2024, was fruitless." *Id.* ¶ 5.

Defendant responds that "discovery generally is not permitted in immigration mandamus cases, as contemplated by this district's Immigration Mandamus Case Procedural Order." Opposition at 1. Defendant further asserts that Plaintiffs have not met their burden of showing

that discovery is appropriate in this case. *Id.* at 2. First, it asserts that Plaintiffs have not

demonstrated any need for discovery to respond to its argument that the Court does not have

jurisdiction over Plaintiffs' APA claim. *Id.* at 7. Second, it contends Plaintiffs have not shown

that discovery related to the *TRAC* factors is warranted, asserting that "[m]ost of the analysis [in

its Summary Judgment Motion] is based on legal principles applied to undisputed facts (*e.g.*, the

first, second, and fourth *TRAC* factors) or factual issues that are within Plaintiffs' control (*e.g.*, the

third and fifth *TRAC* factors), and Plaintiffs have presented no facts suggesting any governmental

misconduct." *Id.* at 2, 7-17. Defendant accuses Plaintiffs of "improper[ly] attempt[ing] to delay

the Court's consideration of Defendant's motion for summary judgment." *Id.* at 2.

## III.    ANALYSIS

### A.    Whether Discovery is Permitted in Immigration Mandamus Cases Under General Order 61 and the APA

#### 1.    General Order 61

Defendant suggests Plaintiffs have acted improperly under General Order 61 because they

"refused" to file a summary judgment motion and now seek discovery even though under General

Order 61, "discovery generally is not permitted." Opposition at 1. Although the discovery

Plaintiffs request is overbroad, as discussed further below, the Court does not find that they have

acted improperly under General Order 61. General Order 61, which is the basis for the Scheduling

Order in this case, states, in relevant part, as follows:

> The clerk's office shall file in each [immigration mandamus case] a
> procedural order which specifies that (a) the defendant shall serve and
> file an answer within 60 days of receipt of service of the summons
> and complaint; (b) subject to sub-paragraph (c), the plaintiff may file
> a motion for summary judgment at any time permitted by the Federal
> Rules of Civil Procedure and this court's local rules, in which event
> defendant may respond as permitted by the Federal Rules of Civil
> Procedure and this court's local rules; (c) if the plaintiff has not filed
> a motion for summary judgment within 90 days of filing the
> complaint, the defendant shall be the party who shall first file a
> motion for summary judgment, and the defendant must serve and file
> that motion within 120 days of service of the complaint; (d) unless a
> motion pursuant to Federal Rule of Civil Procedure 56(f)[3] is filed, the
> plaintiff shall serve and file any opposition and/or counter-motion

---

[3] As the comments to the 2010 Amendment to Rule 56 explain, subdivision (f) has been
renumbered subdivision (d) "without substantial change."

United States District Court
Northern District of California

1

2

3

> within 30 days of service of defendant's motion; (e) defendant may serve and file a reply and/or opposition within 14 days of service of plaintiff's opposition or counter-motion; and (f) if plaintiff filed a counter-motion, plaintiff may serve and file a reply within 14 days of service of defendant's opposition.

4

5

6

7

8

General Order 61 ¶ 2. This section of General Order 61 makes clear that an immigration mandamus plaintiff "may" – but is not required to – be the first party to file a summary judgment motion in the case.  It is equally clear that under this provision, immigration mandamus plaintiffs are not entitled to discovery as a matter of course but may obtain discovery if they establish that it is necessary under the standards that govern Rule 56(d).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The single case cited by Defendant in support of their position that General Order 61 does not "permit" discovery does not support Defendant's position.  *See* Opposition at 1 (citing *Armanios v. USCIS*, No. 23-cv-3598-KAW, slip op. at 4 (N.D. Cal. Feb. 5, 2024)).  There, the Court denied a request for leave to conduct discovery under Rule 56(d) by an immigration mandamus plaintiff based on its finding that the plaintiff in that case had not demonstrated a need for the requested discovery, having brought his own summary judgment motion and having opposed the defendant's summary judgment motion before filing a Rule 56(d) motion.   It is true that the court in that case stated broadly that "Generally, this district's immigration mandamus order does not permit discovery in unreasonable delay immigration matters."  *Armanios v. USCIS*, No. 23-cv-3598-KAW, slip op. at 4 (N.D. Cal. Feb. 5, 2024)).  The court goes on to state, however, that "Section 2 of General Order 61 governs the summary judgment briefing schedule in immigration mandamus cases and does not *provide for* discovery."  *Id*. (emphasis added).  In context, the Court reads these sentences simply as stating that discovery is not permitted in immigration mandamus cases *as a matter of course* but is permissible under Rule 56(d) where a plaintiff can meet the requirements of that rule.  Here, in contrast to *Armanio*, Plaintiffs did not bring the first summary judgment motion or oppose Defendant's summary judgment motion. Indeed, had they done either, they might well have forfeited their opportunity to obtain discovery under Rule 56(d), as did the plaintiff in *Armanio*.   Therefore, the Court concludes that General Order 61 does not bar Plaintiffs' request for discovery.

28

United States District Court
Northern District of California

### 2. The APA

Defendant also asserts that the APA contains a "proscription against discovery," citing 5 U.S.C. § 706, which provides as follows:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> > (1) compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> >
> > > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > > (B) contrary to constitutional right, power, privilege, or immunity;
> > >
> > > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > >
> > > (D) without observance of procedure required by law;
> > >
> > > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> > >
> > > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> *In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party*, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (emphasis added).

The language in italics stands for the proposition that in general, claims asserted under this section must be based on evidence that is contained in the agency record.  It does not, however, establish an absolute prohibition on discovery or use of extra-record evidence to support a claim under Section 706.  Rather, the Supreme Court has found that discovery outside of the record in cases brought under Section 706 may be warranted: 1) where there is a strong showing of bad faith or improper conduct; or 2) where examination of decision makers provides the only possibility for effective judicial review and there have been no contemporaneous administrative findings. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, (1971), overruled on other grounds by

16

*Califano v. Sanders*, 430 U.S. 99 (1977);  *see also Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) ("Only in the rare case in which the record is so bare as to frustrate effective judicial review will discovery be permitted under the second exception noted in *Overton Park*."). Thus, while discovery related to APA claims based on an agency's failure to act is the exception rather than the rule, it is not uniformly barred.

Here, Plaintiffs concede that Defendant has not acted in bad faith or engaged in misconduct.  They maintain, however, that meaningful judicial review cannot be conducted in this case without discovery.  This is a stringent standard that allows for only the most essential discovery.  Nonetheless, courts have permitted discovery in immigration mandamus cases involving undue delay occasionally.  *See, e.g., Edakunni v. Mayorkas*, C-21-0393, W.D. Wash. July 5, 2022; *Iyer v. Mayorkas*, Case No. C-22-2288, USDC, N.D. Cal., docket no. 44, May 4, 2023.

In *Edakunni v. Mayorkas*, the court denied both sides' motions for summary judgment on an unreasonable delay claim involving the application of FIFO to I-539 and I-765 applications and invited a Rule 56(d) motion, stating:

> Nevertheless, the Court is not certain that at this time whether it has all of the information it needs to engage in a thorough examination of how the TRAC factors apply to this case. Specifically, it does not have specific information about the adjudication status of the fourteen newly-added individual plaintiffs. More significantly, Defendant claims to have provided information demonstrating the operation of a FIFO processing rule, but the Court cannot discern the operation of FIFO from the specific documents already provided as part of, or in supplementation to, the certified administrative record. *See, e.g.*, Dkt. Nos. 47-1, 47-2 (charts showing original and Sharma plaintiffs' I-539 and I-765 application filing and processing dates, organized by form filing dates—without explanation of which variables may have caused applications filed around the same time to be adjudicated on different schedules if USCIS follows the FIFO processing rule, or whether applicants who had not filed lawsuits have had their applications adjudicated at the same pace as the named plaintiffs); but see Dkt. No. 48 at 17 (claiming that the same exhibits "overwhelmingly demonstrate[] that USCIS has adjudicated Plaintiffs' applications using FIFO").

*Edakunni*, July 5, 2022 Order at p. 14.

The court subsequently granted in part the motion to supplement the record, stating:

> But even considering both the charts and the declaration, the still

unanswered—and significant—question from the Court's prior Order is whether USCIS is following their stated FIFO processing rule, including "whether applicants who had not filed lawsuits have had their applications adjudicated at the same pace as the named plaintiffs." See Dkt. No. 87 at 15. Defendant has not provided any information about the relative filing and adjudication dates of members of the prospective class beyond the named plaintiffs to allow the Court to determine whether the FIFO processing rule is being evenly applied to all applicants (versus just those who have filed suit) and whether Plaintiffs' applications are being processed pursuant to the FIFO rule in relation to all other applicants (not just vis-à-vis each other).

*Edakunni*, Nov. 15, 2022 Order at 5. The court went on to acknowledge that it was "mindful of making requests upon an executive agency that may disrupt its ongoing duties" and therefore, it "limit[ed] supplementation to the materials most relevant to determining whether relief should be granted." *Id.*

The court in *Edakunni* ordered the government to "supplement the administrative record with information about the respective application filing dates and adjudication dates of all I-539 and I-765 applications filed for H-4 classifications and all I-539 applications filed for L-2 classifications as well as the reason(s) for deviation from the FIFO rule for the one month period of March 2022, for the service centers at which Plaintiffs filed applications." *Id.* The court also permitted a 4-hour deposition of USCIS' Deputy Associate Director of Service Center Operations Connie A. Nolan, who had already provided a declaration about the operation of FIFO in that case. *Id.* at 7. Finally, the court allowed a 7-hour 30(b)(6) deposition on the issue of whether order the requested relief would "simply move all others back one space and produce no net gain" – an assertion the government made in their summary judgment motion without any supporting evidence. *Id.*

In *Iyer*, Judge Kim also recently permitted discovery in an immigration mandamus case involving application of the *TRAC* factors. Case No. C-22-2288, USDC, N.D. Cal., docket no. 44, May 4, 2023. The order in that case does not provide a detailed discussion of the case or the reasons for allowing discovery but the motion indicates that the case involved application of the *TRAC* factors to the plaintiffs' claim that the Government unreasonably delayed adjudication of their EB-5 applications and the allegation that there had been an unjustified stoppage of adjudication of such applications.

### B.    Legal Standards Under Rule 56(d)

Federal Rule of Civil Procedure 56(d) allows the nonmoving party to request additional time to take discovery necessary to oppose a motion for summary judgment. Rule 56 provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). "The purpose of Rule 56(d) relief is to prevent the nonmoving party from being 'railroaded' by a summary judgment motion that is filed too soon after the start of a lawsuit for the nonmovant to properly oppose it without additional discovery." *Hollyway Cleaners & Laundry Co., Inc. v. Cent. Nat'l Ins. Co. of Omaha, Inc*., 219 F. Supp. 3d 996, 1003 (C.D. Cal. 2016) (citing *Celotex Corp. v. Catlett*, 477 U.S. 317, 326 (1986)); see also *Weinberg v. Whatcom Cnty*., 241 F.3d 746, 751 (9th Cir. 2001) ("Rule 56[d] thus protects parties from a premature grant of summary judgment.").

To obtain discovery under Rule 56(d), "[t]he requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp*., 525 F.3d 822, 827 (9th Cir. 2008) (citing *State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998)).

### C.    Discussion

Plaintiffs contend they need the requested discovery to oppose Defendant's summary judgment motion by showing that there are material issues of fact as to the application of the *TRAC* factors and whether the delay in adjudicating Munoz-Barba's application is unreasonable. Defendant contends no discovery is required, citing cases in which courts have held, on summary judgment, that delays of similar length or longer are reasonable as a matter of law. *See* Opposition at 8 (citing *Zheng v. Mayorkas*, No. 23-cv-2707-KAW, 2024 WL 130157, at *5 (N.D. Cal. Jan. 11, 2024) (3.5 year delay found not unreasonable); *Zhang v. Mayorkas*, No. 23-cv-03209-LB, slip

op. at 2 (N.D. Cal. Dec. 17, 2023) (Dkt. No. 24) (same); *Dang v. Mayorkas*, No. 23-cv-02212-LB, 2023 WL 8007993, at *4 (N.D. Cal. Nov. 17, 2023) (same); *Cai v. Mayorkas*, No. 23-cv-2697-LB, slip op. at 6 (N.D. Cal. Nov. 19, 2023) (Dkt. No. 22) (same); *Su v. Mayorkas*, No. 23-cv-566-KAW, — F. Supp. 3d —, 2023 WL 7209630, at *5–7 (N.D. Cal. Oct. 17, 2023) (same)).

The Court declines to decide at this juncture whether the delay in this case is reasonable as a matter of law. The question of whether the delay in a specific case is unreasonable turns on the particular facts of the case. *See Wurtz v. USCIS,* C-20-2163 JCS, N.D. Cal., dkt. no. 27 (Aug. 12, 2020) at p. 6 ("This Court agrees with the general approach that challenges to reasonableness of delay are best considered on an evidentiary record, and respectfully disagrees with the *Ou* court's conclusion that other courts' decisions on the distinguishable facts before them support finding a particular period of delay reasonable as a matter of law"); *Gelfer v. Chertoff*, No. C06-06724 WHA, 2007 WL 902382, at *2 (N.D. Cal. Mar. 22, 2007) ("What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case."). Therefore, the fact that other courts have found delays of similar length to be reasonable does not compel the conclusion that Plaintiffs here will not be able to establish that under the specific facts of this case a similar delay may be unreasonable and thereby defeat Defendant's Summary Judgment Motion.

Similarly, Defendant's reliance on the "unbroken line of authority holding that USCIS's [LIFO] order satisfies a rule of reason," Opposition at 8, is misplaced. While it is true that numerous courts have found that LIFO is a "rule of reason[,]" *see, e.g., Attia v. Mayorkas,* No. 23-cv-869, slip op. (C.D. Cal. Oct. 18, 2023); *Teymouri v. U.S. Citizenship & Immigr. Servs*., No. CV 22-7689 PA (JCX), 2022 WL 18717560, at *4 (C.D. Cal. Jan. 31, 2022); *Zhang v. Wolf*, No. 19-cv-5370, 2020 WL 5878255 (E.D.N.Y. Sept. 30, 2020); *Varol v. Radel*, 420 F. Supp. 3d 1089, 1097 (S.D. Cal. 2019), none of these cases holds that LIFO will *invariably* be a rule of reason, as a matter of law, no matter what circumstances may arise. Indeed, UCSIS itself recognized that LIFO did not make sense in 2012, when it shifted to FIFO because "most Asylum Officers were assigned to address the surge of credible fear, reasonable fear cases, and unaccompanied child cases at the border" and "very few affirmative cases could be adjudicated in any event." Lafferty

United States District Court
Northern District of California

Decl. ¶ 20.

Here, Defendant's own evidence suggests that similar circumstances may have arisen since the expiration of Title 42, approximately one year ago, and the associated surge at the Southwest border. Lehman, for example, states vaguely that because the San Francisco Asylum Office "must divert a substantial majority of available asylum officers to assist with asylum pre-screening interviews at the Southwest Border and other high-priority caseloads" its "capacity to conduct affirmative asylum interviews" has "significantly" decreased from the 40 to 45 interviews a week it was conducting between June 8, 2020 and May 12, 2023. Lehman Decl. ¶ 11. This statement suggests that processing of affirmative asylum applications by the San Francisco Asylum Office has come to a virtual stand-still – and Lehman's similarly vague statement that the situation may improve "once the office's operational posture allows the office to place more asylum officers back on the affirmative asylum caseload" simply states the obvious without providing any information as to when this might occur.[4]

Given that the first *TRAC* factor looks to the statutory timeframe envisioned by Congress – here, 45 days for an asylum interview and 180 days for adjudication of the application under normal circumstances, *see* 8 U.S.C. § 1158(d)(5)(A)(ii) & (iii) – the evidence supplied by

---

[4] Lafferty also provides some statistics about the impact of the expiration of Title 42 on USCIS's overall capacity to process affirmative asylum applications, stating:

> During third quarter of FY 2023, in addition to temporarily assigning nearly all available asylum officers to credible and reasonable fear workloads, USCIS prepared for a substantial increase in encounters of noncitizens at the southwest border in light of the end of the Title 42 policy by providing credible fear training to approximately 500 employees from throughout USCIS. Of these trainees, USCIS assigned approximately 345 employees through the end of June 2023 to temporary asylum duty assignments to support increased credible fear processing by the Asylum Division. Due to this temporary support and reduced credible fear receipts, beginning on June 28, 2023, the Asylum Division is able to assign more Asylum Officers to adjudicate affirmative asylum applications.

Lafferty Decl. ¶ 43. These statistics do not shed any significant light on the impact on the San Francisco Asylum Office specifically of the transferring of UCSIS staff to the border or how many staff members have returned to their regular post. The Court notes that Lehman's declaration is dated January 26, 2024, long after the temporary assignments discussed by Lafferty had apparently ended. Thus, it appears that even if some staff who were transferred to the Southwest border in response to the expiration of Title 42 were moved there only temporarily, other USCIS staff who would ordinarily be processing affirmative asylum applications remain at the Southwest Border.

United States District Court
Northern District of California

Defendant leaves certain unanswered questions about the current circumstances that are critical to the determination of whether Defendant's approach to processing asylum application (which Defendant explained at the hearing is not strictly based on LIFO) constitutes a "rule of reason." In particular, the situation Defendant's declarants have described in their declarations indicates that there is an ever-growing backlog of asylum applications and dramatically diminished capacity to process those applications, raising the possibility that older applications (including Plaintiffs') are continually being pushed further and further back in the line, leaving them to languish indefinitely. As Defendant conceded at the motion hearing, were its approach to processing asylum applications to result in circumstances in which Plaintiffs' application would *never* be adjudicated, that approach would not constitute a rule of reason. Narrow and targeted discovery aimed at this question is therefore necessary to allow for effective judicial review of Plaintiffs' claims.

The Court further finds that the declarations provided by Defendant raise the possibility that the goal LIFO is designed to accomplish, namely, to provide a disincentive to file non-meritorious asylum applications simply to obtain work authorizations, is not being accomplished. *See* Lafferty Decl. ¶ 26 ("LIFO is a capacity-based scheduling system: during periods when asylum applications and additional caseloads surge, not all recently filed applications can be scheduled, even if they meet the above-mentioned criteria, due to staffing limitations, physical office space, and shifting priorities that require Asylum Officers to be reassigned to other urgent caseloads, such as credible and reasonable fear screenings, Title 42 non-refoulement interviews, and, previously, MPP fear assessments."). If USCIS is unable to schedule interviews as to the LIFO category (b) applicants (those whose applications have been pending for less than 21 days) and is simply adding those applications to the backlog, there may be a material dispute of fact as to whether LIFO creates any greater disincentive to filing non-meritorious applications than applying FIFO to the backlog given that the delay in either scenario appears to be significant. Therefore, narrow and targeted discovery is appropriate on this issue as well.

The Court finds that Plaintiffs' request for discovery is overbroad, however, with many of the items on their list failing to identify the specific facts they seek or why those facts are

necessary to oppose summary judgment.  Many items also seek discovery covering a time period that is much longer than necessary to oppose Defendant's Summary Judgment Motion.  As discussed above, the evidence offered by Defendant raises the possibility that the application of LIFO is not reasonable in light of developments that have occurred in the last year or two.  Plaintiffs have not established that they need discovery outside of that time period and certainly have not shown that discovery dating back to the original adoption of LIFO, in 1995, is appropriate.

The Court addresses Plaintiffs' specific discovery requests below.  The item numbers referenced below are based on the paragraph numbers in the Crabtree Declaration.

- Items 11 and 12:  These requests seek all documents "referenced by and relied upon" Lafferty and Lehman in their declarations.  These requests do not identify the specific facts Plaintiffs seek and therefore they are DENIED.

- Items 13, 14, 15, 24, 33, 34 and 38, seeking the Asylum Division's "productivity matrix" referenced by Chief Lafferty in paragraph 11[5]; sources Lehman relied on in paragraphs 10-12 of her declaration, "documentation showing how many asylum officers actually conducted affirmative asylum interviews nationally and in San Francisco per day on average during the time period of August 1, 2020, to January 31, 2024, and interrogatory responses from Lehman on these topics:  Defendant confirmed at the motion hearing that the "productivity matrix" referenced in Lafferty's declaration refers to Chart 2, found in paragraph 32 of his declaration, which covers the period 2012 through 2023 Q3.[6]  Lehman's declaration provides average weekly interviews conducted by the San Francisco Asylum Office through May 12, 2023.  While the information already provided addresses the first three years of the period during which Plaintiffs' application was pending, it provides little information about the impact of developments at the Southern border on the processing of affirmative asylum

---

[5] The Crabtree Declaration references  paragraph "111."  The Court assumes this is a typographical error.

[6] At the motion hearing, defendant confirmed that the data on this chart goes through September 30, 2023.

applications over the last year, which may be a significant consideration in determining whether Plaintiffs can defeat Defendant's summary judgment motion.  Because Plaintiffs' application falls within the jurisdiction of the San Francisco Asylum office, the information sought by Plaintiffs' is particularly pertinent to *TRAC* factor I. Therefore, these requests are GRANTED in part as follows: Defendant is ordered to produce a declaration by a person with knowledge, sworn under penalty of perjury, stating for each month beginning with May 2023 to the present the average number of asylum interviews per week that were conducted by the San Francisco Asylum Office in that month. Defendant shall also provide a declaration addressing the percentage of asylum applications filed nationally within a particular quarter that were added to the backlog (ie., LIFO category (c)) and adjudicated within that same quarter, for each quarter beginning January 2020 to the present. Plaintiffs have not demonstrated that they need the documents Lehman relied upon in support of the statements in paragraphs 10-12 of her declaration or interrogatory responses and therefore, that request is DENIED.

- Items 16, 35 seeking discovery related to the processing of requests for expedited interviews by the San Francisco Asylum Office: Lehman states in her declaration that Plaintiffs did not request an expedited interview based on a humanitarian emergency, Lehman Decl. ¶ 16, while Plaintiffs' counsel states that he did not file such an application for his clients because in his experience such applications are denied in all but the most extreme circumstances.  The Court does not find that Plaintiffs have demonstrated a need for this discovery.  Their claim is based on whether the agency has unduly delayed processing of the application that Plaintiffs actually filed, not whether they might have pursued some other process.  Therefore, these requests are DENIED.

- Item 17, seeking "legal authority for the expedite program": To the extent this request seeks "legal authority" it is not a proper subject of discovery.  Plaintiffs also have not demonstrated that this discovery is necessary to oppose Defendant's Summary

24

Judgment Motion. These requests are DENIED.

- Item 18, seeking production of "any policy memorandum or directive" implementing LIFO since it was adopted in 1995: This request is DENIED on the basis that it is overbroad in time and Plaintiffs have not demonstrated that this discovery is necessary to oppose Defendant's Summary Judgment Motion.

- Item 19, seeking "production of the source relied upon by Chief Lafferty for the statement that LIFO reduced the incentive to file non-meritorious asylum applications": This request is DENIED on the basis that it does not identify specific facts or show that those facts are necessary to oppose Defendants' Summary Judgment Motion.

- Items 20, seeking production of "all sources relied upon by Chief Lafferty to reach . . . two seemingly inconsistent conclusions[,]" namely, the conclusion in paragraph 21 that in 2012 LIFO was "undermined" due to the surge at the border and the conclusion in paragraph 56 that "the LIFO scheduling system is being successful employed to reduce the backlog" even though a similar surge is occurring now: This request points to an alleged inconsistency in Lafferty's statements but does not identify specific facts or show how they are needed to oppose Defendant's Summary Judgment Motion. This request is DENIED.

- Item 21, seeking production of "any policy memorandum or directive" re-implementing LIFO in 2018: This request is DENIED on the basis that it is overbroad and does not identify specific facts or show how they are needed to oppose Defendant's Summary Judgment Motion.

- Item 22 and 37, seeking discovery in the form of an interrogatory response as to: (a) what constitutes a "surge," (b) whether and how the determination that the Asylum Division is experiencing a "surge" suspends, or otherwise affects, LIFO scheduling, and (c) for which months or years since LIFO's implementation in the 1990s, USCIS has determined itself to be experiencing a "surge": This request is made in response to Lafferty's statement in paragraph 26 of his declaration that during a surge, cases that

United States District Court
Northern District of California

cannot be immediately scheduled in accordance with their respective LIFO priorities due to capacity constraints are placed into the backlog. ECF 23 para. 26.  As discussed above, the impact of the recent surge at the border on the implementation of LIFO may be directly relevant to *TRAC* factor 1.  This request is overbroad, however.  This request is GRANTED in part as follows: Defendant shall produce a declaration by a person with knowledge, sworn under penalty of perjury, addressing the following question:  Identify the months between July 2020 and the present in which all or some applications that fall into LIFO category (b),  that is, applications filed within 21 days, have been placed into the backlog due to a "surge" rather than being immediately set for an interview, and provide an estimate of the percentage of applications that fall into category (b) for each month that were not processed under LIFO's priority system.

- Item 23, seeking "all Asylum Division memoranda and policy documents employing the term "surge":  This request is DENIED on the basis that it is overbroad and does not identify specific facts or show that those facts are necessary to oppose Defendants' Summary Judgment Motion.

- Item 25, seeking "production of  . . .information through any documentation maintained by USCIS  . . .  relevant to whether LIFO is actually a rule of reason[,]" given that Chart 2 of Lafferty's Declaration shows that "the backlog grew by 77% in 2015, the year after LIFO was suspended and FIFO was implemented and, by comparison, grew by the nearly identical 78% in 2023, a year in which LIFO had already been implemented for five years":  This request points to an alleged inconsistency in Lafferty's statements but does not identify specific facts or show how they are needed to oppose Defendant's Summary Judgment Motion.  This request is DENIED.

- Item 26, 27 seeking "production of USCIS memoranda and policy documents employing the terms "non-meritorious" and "cancellation cases" and "the source upon which Chief Lafferty relies to make the assertions that certain cases are "non-meritorious" and/or "cancellation cases":  This request is DENIED. These requests are

made in response to Lafferty's statement in paragraph 35 of his declaration that the USCIS has noticed an increasing number of non-meritorious asylum applications submitted primarily to obtain employment authorization as well as an increasing number of late-filed "cancellation cases."  The Court finds that Plaintiffs have not demonstrated this discovery is necessary for judicial review of their claims.

- Item 28, seeking "production of any document in Plaintiffs' immigration records ('A file') containing either the term "non-meritorious" or "cancellation":  Plaintiffs assert that such references in their file would imply "the agency may be conducting some sort of initial, prima facie determination of asylum applications."   The Court is not persuaded that discovery of all references to "cancellation" in Plaintiffs' A-file is necessary as it appears to be undisputed that Plaintiffs' application falls into that category and thus, references to "cancellation" would not appear to imply any initial, prima facie determination is being conducted.   Nor is the Court persuaded that there is any basis, on the current record, to order discovery as to use of the term "non-meritorious" in Plaintiffs' file.  This request is DENIED.

- Item 29, seeking "production of documents and interrogatory responses responsive to the question of how many applicants [the] 80 [new] asylum officers [hired with FY 2022 funding] have interviewed on average per month (after receiving their 300 hours of training):  This request is GRANTED in part.  In light of the statements in Lafferty's declaration about the hiring of 80 new asylum officers to address the oldest cases in the backlog, *see* Lafferty Decl. ¶ 49, the Court finds that Plaintiffs are entitled to an updated declaration describing: 1) the process that is being used to select which applications these officers (and any other officers who have been assigned to work down the backlog) are processing (*e.g.*, a strict FIFO policy, some modified FIFO approach that also takes into consideration factors other than the filing date of the application, or modified LIFO); and 2) the number of applications adjudicated by these officers each month from January 2023 to the present.

- Item 30, seeking any evidence that USCIS is actually scheduling affirmative interviews

United States District Court
Northern District of California

27

1      in accordance with the priorities outlined in LIFO":  This request is DENIED on the

2      basis that it is overbroad and does not identify specific facts or show that those facts

3      are necessary to oppose Defendants' Summary Judgment Motion.

4   •  Item 32, seeking a response to the following interrogatory: "How many asylum

5      interviews were actually (as opposed to expected to be) conducted on average

6      nationally over the period of August 1, 2020, to January 31, 2024 (the period of time in

7      which Plaintiffs' applications have been pending)"?:  This request is GRANTED in

8      part and DENIED in part. Because the Lafferty Declaration includes a chart showing

9      the number of asylum applications processed for the period 2012 through 2023 Q3, the

10      Court concludes that Plaintiffs have not demonstrated sufficient need for this

11      information for that period.  However, Defendant shall update the Lafferty Declaration

12      to provide the number of interviews conducted and the number of applications

13      adjudicated for the fourth quarter of 2023 as well as the first two quarters of 2024.

14   •  Item 36, seeking an interrogatory response to the following interrogatory:  (a) how

15      many asylum applicants nationally actually applied for, and were granted, Advance

16      Parole while their asylum request was pending between August of 2020 and January of

17      2024? Of those individuals, how many were applicants who entered without

18      inspection.":  According to Plaintiffs, "This interrogatory is necessary to determine the

19      genuine availability of such 'relief' and how, if at all, this offsets the human health and

20      welfare *TRAC* factor concerns in this case."  As Plaintiffs did not apply for Advance

21      Parole, the Court concludes they have not established a need for this discovery. This

22      request is DENIED.

23   •  Item 39, seeking a response to the following interrogatory:  "were there any increased

24      applications from certain nationalities or regions from January 2014 to December

25      2017?": This request is DENIED as Plaintiffs have not established a need for this

26      discovery.

27   •  Item 40, seeking a response to the following interrogatory: "are any asylum officers

28      still operating at a reduced capacity due to the Covid-19 global pandemic?": This

United States District Court
Northern District of California

request is in response to Lafferty's statement in paragraph 55 of his declaration that "although most asylum office operations have since returned to normal [after the pandemic], the lingering effects of the pandemic will be felt for a long time.":  This request is DENIED as Plaintiffs have not established a need for this discovery.

- Item 41, seeking a response to the following interrogatory: (a) why and when are some interviews scheduled in a manner not following LIFO, and (b) what kind of official makes those scheduling decisions?: This request is DENIED except as stated above in regards to item 29 on the basis that it is not sufficiently specific as to the facts Plaintiffs seek.

- Item 42, seeking the following information: For applications filed within the jurisdiction of the San Francisco Asylum Office: (a) How many applications were decided between August 1, 2020, and January 31, 2024? (b) On what dates were these applications received? (c) On what dates were these applicants interviewed? (d) On what dates were the decisions issued? (e) Were any expedited, "short notice" or other exigent factors applied in these cases?: Except as stated above in regard to Items 13, 14, 15, 24, 33, 34 and 38, this request is denied on the basis that it is overbroad.

## IV.    CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part. Defendant shall provide to Plaintiffs the discovery materials listed above within sixty days. Within the same period, the parties shall meet and confer and submit a joint proposed briefing schedule for summary judgment.

**IT IS SO ORDERED.**

Dated:  June 3, 2024

_____
JOSEPH C. SPERO
United States Magistrate Judge